UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

**NATHAN A. VINCENT,**
an individual,

        Plaintiff,

*-vs-*

**MT. ELLIOT CEMETERY ASSOCIATION,
d/b/a RESURRECTION CEMETERY,**
a domestic nonprofit corporation,

        Defendant.

Case No.:
Hon:
Magistrate:

_____/

BURGESS, SHARP & GOLDEN, PLLC
Attorneys for Plaintiff
BY:   Heidi T. Sharp (P 69641)
43260 Garfield Road, Suite 280
Clinton Township, MI 48038
(586) 226-2627
heidi@bsglawfirm.com
_____/

**COMPLAINT AND DEMAND FOR JURY TRIAL**

Nathan A. Vincent ("PLAINTIFF"), through his attorneys at Burgess, Sharp, & Golden, PLLC, states the following for his claims against Mt. Elliot Cemetery Association, d/b/a Resurrection Cemetery ("DEFENDANT"):

1. Plaintiff is a resident of the County of Macomb, State of Michigan.

2. Defendant is a domestic nonprofit corporation that does business throughout the State of Michigan.

3. The events giving rise to this cause of action occurred in the township of Clinton, Macomb County, Michigan.

4. At all relevant times, Plaintiff was employed by Defendant.

5. This court has jurisdiction under the Americans with Disabilities Act, 42 USC 12101 et seq.

6. Plaintiff also brings claims under Michigan's Persons with Disabilities Civil Rights Act (MCL 37.1201), over which this Court has pendent jurisdiction under 28 USC 1367.

7. The amount in controversy exceeds $25,000, exclusive of interests, costs, and attorney fees.

## FACTUAL ALLEGATIONS

8. Plaintiff began employment with Defendant on October 15, 2014, as a family counselor.

9. As a family counselor, Plaintiff was responsible for the sale of cemetery property and services. This required him to schedule appointments with prospective families who purchased burial property in advance and accommodating those families who recently lost a loved one.

10. Family counselors for Defendant are compensated on commission.

11. Family counselors for Defendant also worked a "duty" shift. This involved the "duty counselor" sitting at one of two desks near the reception area and stocking the sales rooms, confirming sales, releasing holds, and accurately updating new holds. Additionally, duty counselors handled incoming calls where a prospect would call inquiring about purchasing property, markers, monuments, and various accessories. Duty shifts are an essential part of the success or lack thereof for a family counselor because they provide immediate opportunity for sales, which provide an opportunity for commission. Each family counselor is assigned a specific number of duty days per calendar month.

12. Duty shifts require a working telephone and the ability to communicate with callers.

13. Plaintiff is unable to effectively process certain speech energy, specifically, consonants that are in the mid- to high-frequency energy. This results in speech sounding "garbled" to Plaintiff. His ability to process speech is further compromised where background noise is high. This information was provided to Defendants by Plaintiff's physician, Dr. Adam Rourke.

14. When Plaintiff began training for employment with Defendant on October 15, 2014, he announced to everyone in his training group that he was

profoundly hearing impaired (also commonly referred to as 'deaf'). Plaintiff advised that he cannot always hear people who are not facing him directly, and that this can make him appear standoffish or aloof. Plaintiff further requested that if this were to occur, his fellow trainees should simply gesture to get his attention.

15. Throughout the training, Plaintiff could not hear his instructors and respectfully requested that they repeat themselves.

16. In December of 2014, Plaintiff approached Tim Burrows ("BURROWS"), a training instructor and Director of Sales for Defendant. Plaintiff advised that he was having difficulty with Defendant's telephone system. The system was a Shoretel 230.

17. As a result of his difficulties with the Shoretel 230 system, Plaintiff requested two accommodations of Burrows: 1) a caption telephone; and 2) a noise cancelling headset. Burrows did not comment and instead went to his office and closed the door behind him.

18. In December of 2014, Plaintiff again met with Burrows to discuss his prospecting plan. Plaintiff again stated that he needed a caption telephone and the noise canceling headset. Burrows ignored the request and instead focused the meeting on prospecting, call ratios, and percentages.

19. Due to the indifference displayed by Burrows, Plaintiff went to Best Buy on December 12, 2014, and purchased a Bose noise-cancelling headset for $299.99. He also purchased an adapter, enabling the headset to connect to the cemetery's Shoretel 230 telephone system.

20. The headset purchased by Plaintiff was not compatible with the Shoretel 230 system. Plaintiff could hear clients and prospects, but they could not hear Plaintiff. Plaintiff called Shoretel and the headset manufacturer numerous times, to no avail. The headset was, however, compatible with Plaintiff's iPhone. As a result, Plaintiff made telephone calls from his iPhone using his headset in order to ensure that he could hear clients and they could hear him.

21. Burrows expressed displeasure that "Resurrection" would not appear on the caller identification when Plaintiff made outgoing calls. Additionally, Plaintiff could not answer incoming calls or communicate effectively. Every time that a client or prospect called Plaintiff, he would have to direct the call to voicemail and then listen to the voicemail to determine who called.

22. Plaintiff's challenges became apparent to the co-workers who sat close to him. Plaintiff began to search the internet daily and contact headset manufacturers for any possible assistance. Every day, he contacted his mother or his wife to see if the latest adjustment allowed them to hear him.

23. On January 5, 2015, Plaintiff purchased a second headset, again at his own expense, from wwwfactoryoutletstore.com.

24. The second headset was a Plantronics, and was more compatible with the Shoretel 230 system. Callers, however, continued to state that they had a difficult time hearing Plaintiff.

25. On January 23, 2015, Plaintiff asked Jason Tuttle ("TUTTLE"), who worked in IT for Defendant, whether there was a way to raise the volume on his telephone. Tuttle simply pointed to the volume button on the telephone. Plaintiff explained that he was aware of the volume button, but was asking whether there was a way to increase the receiver and microphone volume. Plaintiff researched the Shoretel 230 system on his own and determined that the volume in the microphone could be adjusted. Plaintiff provided Tuttle with information gathered from the Shoretel Website showing that the phone has certain coding features that allow for the volume to be increased. These features are specific to IT functions and would have required Tuttle to be the individual who made the changes.

26. Plaintiff wears a headset that covers both of his ears because his hearing loss is bilateral. His coworkers began to taunt him because of his headset. Frank Oldani ("OLDANI") asked questions such as "At what level is the plane? Are you ascending or descending or gearing for take-off?" Plaintiff

pretended not to be bothered by Oldani's comments, at which point Oldani rolled his eyes at Plaintiff.

27. In the meantime, Tuttle did not respond to Plaintiff's inquiries about telephone volume. Tuttle's failure to respond to Plaintiff's inquiries impeded Plaintiff's chances for success, as Plaintiff was unable to secure sales that would have occurred during his duty shift. Plaintiff was unable to effectively gather information from these potential customers over the telephone.

28. In March of 2015, Burrows began to harass Plaintiff about his cognitive abilities and his hearing loss, saying things such as: "What's up with your hearing? It never presented itself when interviewing!" "How do you learn?" and "What does it take for you to understand something?"

29. Following Burrows' comments, Plaintiff requested a meeting with Defendant's human resources director, Michael Berger ("BERGER"). Plaintiff advised Berger of his concerns and Burrows' comments, but Berger dismissed Plaintiff.

30. In March of 2015, Plaintiff obtained the cost of a headset to use with the Shoretel system. Burrows approved Defendant's purchase of the headset. Plaintiff was to reimburse Defendant from his next paycheck.

31. On March 19, 2015, Plaintiff again spoke with Berger about Burrows' comments related to his hearing. Berger again dismissed Plaintiff and told him to talk to Burrows about it.

32. Around March 20, 2015, Plaintiff eventually received a headset compatible with the Shoretel system, which caused his sales production to increase significantly.

33. In August of 2015, Plaintiff asked Burrows if he could move to a vacant work area to accommodate his disability, because the vacant work area was in a quieter location. He told Burrows that his headset was making a high-pitched noise that he could not hear but that other counselors were laughing about. Specifically, Oldani and Izzy Selimi laughed about the high-pitched noise that Plaintiff's hearing aids were making.

34. Burrows denied Plaintiff's accommodation request.

35. On August 31, 2015, Plaintiff's headset stopped working. Plaintiff gave the headset to Peggy Scott ("SCOTT"), a sales coordinator for Defendant, to have the headset sent in.

36. On September 2, 2015, Frank Oldani ("OLDANI") replaced Burrows as the Director of Sales.

37. Immediately after his promotion, Oldani wrote Plaintiff up four times. He accused Plaintiff of unprofessional behavior, mocked his work efforts, and

issued Plaintiff a write-up. Oldani also called Plaintiff into his office several times per day to say that Plaintiff's work was unacceptable. Despite Oldani's interruptions, Plaintiff still met his monthly and quarterly goals.

38. Oldani approached other administrative workers and told them to keep a look out for mistakes that Plaintiff made. He also told Plaintiff that he was "bad for the brand."

39. After at least two meetings with Oldani, Plaintiff became physically ill from the stress.

40. On September 10, 2015, Plaintiff brought a caption telephone from home to set up at work. Tuttle assessed it and determined that it was compatible with Defendant's system. Tuttle advised that he would contact Shoretel.

41. On September 11, 2015, Oldani approved Plaintiff's use of a caption telephone from home. Plaintiff went to Tuttle regarding the caption telephone, but received no answer.

42. Also on September 11, 2015, Plaintiff had a meeting with Oldani wherein Plaintiff advised Oldani of his ongoing challenges with the company telephone system.

43. By September 18, 2015, Plaintiff still had not heard back from Tuttle regarding his caption telephone, and so he sent him an e-mail to follow up.

44. On September 21, 2015, Oldani issued Plaintiff the first of a number of write-ups. The write-ups were for issues related to policy changes, procedural changes, and changing workplace practices. The entire sales staff for Defendant was regularly advised to adhere to these specific changes. However, Oldani only disciplined Plaintiff.

45. On September 22, 2015, Plaintiff used his iPhone to contact clients and prospects.

46. On September 24, 2015, Plaintiff's headset was still not available. He requested an update from Tuttle and did not receive one.

47. By October 1, 2015, Tuttle had still not responded to Plaintiff's inquiries regarding his caption telephone.

48. On October 5, 2015, Plaintiff requested another meeting with Berger to discuss his requests for accommodations, due to the amount of time that it was taking for anyone to contact him regarding his headset or his caption telephone. Berger responded via e-mail the next day. He copied Oldani and Burrows on the e-mail.

49. On October 8, 2015, Berger requested a meeting with Plaintiff, suggesting that this was the first time that he heard about Plaintiff being deaf.

50. On October 9, 2015, Plaintiff was again written up by Oldani for poor performance. However, Plaintiff's sales in multiple months at a level equal

to those of his peers, even though they had years of cemetery sales experience where Plaintiff had none.

51. As of October 12, 2015, Plaintiff's headset was still not available.

52. On October 14, 2015, Plaintiff received an e-mail from Scott stating that his headset was repaired and that it would be shipped within two days. All of Plaintiff's supervisors were copied on the e-mail.

53. On October 15, 2015, Plaintiff was again written up for poor performance. Oldani knew of the issues with Plaintiff's equipment and, therefore, the fact that Plaintiff's performance was hindered because he could not effectively pick up sales during duty shifts. Nonetheless, Oldani wrote Plaintiff up.

54. On October 16, 2015, Plaintiff was written up specifically for working from home. All employees for Defendant are permitted to work from home.

55. On October 22, 2015, Plaintiff met with Berger, who asked whether Plaintiff's hearing loss was "new." The same day, Plaintiff attempted to operate his "repaired" headset, which was in fact still broken and incompatible.

56. On October 23, 2015, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC").

57. On October 28, 2015, Oldani disciplined Plaintiff twice within two hours. One write-up was for procedural issues that were discussed with all of

Defndant's staff, Plaintiff that he was only permitted to make telephone calls on the headset from the conference room. Plaintiff protested and told Oldani that he could only make calls from his caption phone. The other write-up was because Plaintiff forgot to bring his training assignments related to his multiple unfounded write-ups.

58. Oldani also took a customer away from Plaintiff after the customer praised Plaintiff's work. Oldani behaved as though he had secured the customer and assigned the file to another family counselor. He accused Plaintiff of prompting the customer to contact Oldani.

59. On November 2, 2015, Plaintiff provided Berger with his response to Oldani's write-ups. He advised Berger that he was no longer comfortable meeting with Oldani based on Oldani's actions on October 28.

60. On November 7, 2015, Berger attended Plaintiff's weekly performance evaluation with Oldani. Although scheduled to last for one hour, Oldani lectured Plaintiff for two hours and twenty minutes. Plaintiff asked Berger if he could continue to work from home because of the caption telephone there. Oldani resisted this request at which point Berger advised, for the first time, that Plaintiff's requests for accommodations needed to be in writing. Oldani also presented Plaintiff with a list of mistakes that he alleged Plaintiff

to have made. Plaintiff acknowledged some of the mistakes but disagreed with the majority of them.

61. Plaintiff was subsequently disciplined on November 12, 17, and 23 for the same issues for which he was previously disciplined, including low sales, working from home, and inaccurate notekeeping. Again, Plaintiff had been meeting his sales goals despite the fact that his accommodation requests were repeatedly ignored. Additionally, all of Defendant's staff worked from home and notekeeping had been discussed with all of them. When Plaintiff reminded Oldani that other counselors had overdue items in connection with their notekeeping, Oldani advised him that this was none of his business.

62. On November 22, 2015, Plaintiff made a sale of $28,800.00.

63. Plaintiff was terminated on November 23, 2015.

64. Plaintiff filed another charge with the EEOC regarding his retaliatory termination on February 10, 2016.

65. Plaintiff was issued right-to-sue letters by the EEOC with regard to his charges on December 13, 2016 and December 16, 2016.

## COUNT I
## DISCRIMINATION UNDER THE AMERICANS WITH DISABILITIES ACT AS AMENDED.

66. Plaintiff incorporates the preceding paragraphs by reference.

67. Plaintiff is a person within the meaning of section 101(7) of the Americans with Disabilities Act as Amended ("ADAAA"), 42 USC 12111(7).

68. At all relevant times, Plaintiff was employed by Defendant.

69. Defendant was Plaintiff's employer as defined under the ADAAA. 42 USC 12111(5)(a).

70. At all relevant times, Plaintiff was an individual with a disability within the meaning of Section 3(2) of the ADAAA. 42 USC 12102(2).

71. Plaintiff has a physical or mental impairment that substantially limits one or more of his major bodily functions, has a record of the impairment, and is regarded by Defendant as having the impairment.

72. Plaintiff is a qualified individual with a disability as that term is defined in ADAAA, 42 USC 12111(8).

73. Plaintiff was treated differently than others employed by Defendant who did not have a disability.

74. Plaintiff is an individual who, with a reasonable accommodation, can perform the essential functions of his job for Defendant.

75. Defendant refused to accommodate Plaintiff's disability.

76. Defendant failed to undertake any good faith efforts, in consultation with Plaintiff, to identify and make reasonable accommodations for him.

77. Defendant conducted itself with malice or reckless indifference to the federally protected rights of Plaintiff.

78. As a direct and proximate result of Defendants' discrimination against Plaintiff on the basis of disability, Plaintiff has suffered lost wages, benefits, and loss of employment opportunities.

## COUNT II
## RETALIATION IN VIOLATION OF THE ADAAA.

79. Plaintiff incorporates the preceding paragraphs by reference.

80. Plaintiff was repeatedly disciplined and terminated within one month of filing a charge at the EEOC.

81. Defendant's proffered reasons for Plaintiff's termination were mere pretext to hide the discriminatory and retaliatory motive for terminating Plaintiff.

82. Defendant's conduct constitutes a violation of the ADAAA.

83. Defendant's retaliation against Plaintiff has caused or continues to cause Plaintiff to suffer substantial damages for pecuniary losses, mental anguish, loss of enjoyment of life, and other non-pecuniary losses.

## COUNT III
## VIOLATIONS OF THE MICHIGAN PERSONS WITH DISABILITIES CIVIL RIGHTS ACT ("PWDCRA").

84. Plaintiff incorporates the preceding paragraphs by reference.

85. At all relevant times, Plaintiff was an employee, and Defendant was his employer, covered by and within the meaning of PWDCRA, MCL 37.1201.

86. Plaintiff's hearing impairment qualifies him as a protected individual under the PWDCRA.

87. Plaintiff's disability was unrelated to his ability to perform the duties of his job.

88. Defendant violated the PWDCRA, as described above, by discriminating against Plaintiff.

89. Plaintiff's disability, history of disability, or being regarded as having a disability was one of the motives that made a difference in Defendant's decision to terminate his employment.

90. Defendant's actions were intentional.

91. As a direct and proximate result of Defendant's unlawful actions against Plaintiff, Plaintiff has sustained injuries and damages, including, but not limited to, loss of earnings, loss of career opportunities, mental and emotional distress, and loss of the ordinary pleasures of everyday life.

## COUNT IV
## RETALIATION IN VIOLATION OF PWDCRA.

92. Plaintiff incorporates the preceding paragraphs by reference.

93. Plaintiff was repeatedly disciplined and terminated within one month of filing a charge at the EEOC regarding the discrimination that he experienced due to his disability.

94. Defendant's proffered reasons for Plaintiff's termination were mere pretext to hide the discriminatory and retaliatory motive for terminating Plaintiff.

95. Defendant's conduct constitutes a violation of the PWDCRA.

96. Defendant's retaliation against Plaintiff has caused or continues to cause Plaintiff to suffer substantial damages for pecuniary losses, mental anguish, loss of enjoyment of life, and other non-pecuniary losses.

Plaintiff prays for relief as follows:

A. An award of damages, which includes, but is not limited to, back pay, front pay, lost wages, lost employee benefits, attorney fees and costs, and compensatory damages, and an appropriate award of interest;

B. Liquidated damages where appropriate;

C. All damages and other relief afforded by law;

D. An award of punitive damages where appropriate in an amount to be proven at trial;

E. Attorneys' fees and costs as provided by law; and

F. Such other relief as the Court may deem just and equitable.

Dated: March 7, 2017                    Respectfully Submitted,

                                            BURGESS SHARP & GOLDEN, PLLC
Attorneys for Plaintiff

/s/ Heidi T. Sharp
Heidi T. Sharp, P69641
43260 Garfield, Suite 280
Clinton Township, MI 48038
586-226-2627
heidi@bsglawfirm.com

## **DEMAND FOR JURY TRIAL**

Plaintiff, through his attorneys at BURGESS, SHARP, & GOLDEN, PLLC, hereby makes a demand for a jury trial in this matter.

Dated: March 7, 2017

Respectfully Submitted,

BURGESS SHARP & GOLDEN, PLLC
Attorneys for Plaintiff

/s/ Heidi T. Sharp
Heidi T. Sharp, P69641
43260 Garfield, Suite 280
Clinton Township, MI  48038
586-226-2627
heidi@bsglawfirm.com